Curia, per Harper, Chancellor.
Upon reflection I have, in some degree, modified my opinion in the present case; and as it is of a class of cases of frequent occurrence, in relation to which the principles are in a good decree unsettled, I shall throw out such suggestions as occur to me.
I cannot doubt but that John S. Field is concluded, by the execution of his bond with Henry Field, to deny that the latter continued guardian by virtue of his first appointment. There was certainly no new appointment, and the bond recites him to be guardian. It is not questioned, I believe, that Henry Field, himself, would be so concluded, and in contemplation of law, it is equally the deed of both. If, as suggested in argument, it were alleged that Henry Field had. represented to John S. Field that he was guardian when he was not, and by this false representation had induced him to join in the bond, perhaps a question might be made whether the latter might not be entitled to relief, on the score of the fraud practiced upon him by the former. Though, even in this case, it might be said that it was his own laches, to execute the bond without proper enquiry. But this is not the case made by the bill. There is no charge of fraud on the part of Henry Field, or that John S. Field was ignorant of the order of the Court, or any of the circumstances. Or, if he had executed the bond with a view to a future appointment, and delivered it to the officer, this wmild be a delivery as an escrow, and if the appointment were never made, the bond would never take effect. But this case is not made, or pretended.
Supposing him to have executed the bond with full knowledge of the circumstances (and this is the proper presumption in the absence of any allegation to the contrary, and the evidence renders it highly probable) it is plain that to permit him to repudiate the bond would be to enable him to practice a fraud on Stoney. It is said that estoppels are not favoured in Equity, but the validity of this bond must be judged of by the rules of law, and the application of estoppels is to prevent fraud. A creditor can do nothing to vary the liability of a surety, even to his apparent benefit; but is it pretended that the creditor *383 lias done any such thing in relation to the present matter'?
Then, as to the relative liability of the various sureties, I must regard the case as one in which the guardianship was never revoked, but new security given as on a continuing guardianship. And, undoubtedly, this is the bond which John S. Field intended to give and supposed himself to have given — nor is he held bound for any thing for which he did not intend to be bound.
If these bonds had been given atthe same time, on occasion of the first appointment of guardian, the case would come within the principle of Dearing vs. Winchelsea. As in that case (mistakenly quoted in the circuit decree) each would have been bound for the entire conduct of the officer, so long as he should continue in office, but each could have limited the extent of his liability. by the penalty of his bond. In that case the obligee might recover both penalties, and if one surety had paid more than the other, there would be a right of contribution, in proportion to the extent of their liabilities.
If a guardianship should be revoked and so continue, the surety would be liable for every thing which the guardian had received up to that time and should afterwards fail to pay over. Nor would it be necessary to shew that the guardian had actually wasted the funds, or committed any act of mal-administration before the revocation. But if, after the revocation, the guardian, as an individual, should obtain the un-authorised possession of a part of the infant’s estate, the surety would not be held liable for that.
If the guardianship should be revoked, and a different person appointed guardian, it would be said, in general, that the sureties of the former were chargeable only with past liabilities, and those of the latter for future ones. Yet, I apprehend, they might be both liable for the same money; and in relation to the ward, the securities regarded as cumulative. Upon the new appointment, it would be the duty of the former to pay over the funds in his hands to the new guardian. If his surety were sued on his bond, in order to defend’himself,fit would be necessary to show that the funds had been so paid over. It would be the duty of the new guardian to collect from the former the *384 funds in his hands. If he neglected to do so he would he liable for the default, and, if sued, in order to defend himself, he would be obliged to show that he had used due diligence, or that the former guardian was insolvent.
The case seems the same when the guardianship is revoked, and afterwards committed to the same person, except so far as a difficulty arises from the guardians’s duty of paying to himself, and collecting from himself. If the former sureties were sued, would it be any hardship to require them to show that the funds were actually in the guardian’s hands, after the second appointment'? If he were shown to have actually wasted the funds during his first administration, or to have been insolvent, could they, on any principle of justice or law, defend themselves by the technical presumption of his having paid to himself I Or, if the new sureties were sued, could they be permitted to show that their principal was insolvent during his first administration, and so could not collect from himself, when they have guaranteed his solvency 1 In some of the cases it is said that where no previous default is, in fact, shown, and the officer makes up his accounts, and charges himself in his books, as under his new appointment, this is evidence of his having paid to himself; and the former sureties will be discharged. And this is going quite far enough. Such was the case of Simkins vs. Cobb, 2 Bail. 60. Though in that case the party was appointed to a new and distinct office, and there could be no right of compensation, or reimbursement, between the different sets of sureties. I doubt if the rule should be held to apply when he is simply re-appointed to the same office. It was the view of these difficulties which suggested the rule in the case of Trimmier vs. Trail, in the analogous case of an administrator — that with respect to funds in the administrator’s hands, at the time of the giving of new security, the securities should be regarded as cumulative, and the former sureties only discharged from future liabilities. The new sureties would be chargeable for every thing. There is certainly one discrepancy between the case of Trimmier vs. Trail, and that of Vaughan vs. Evans, 1 Hill. Ch. 414, in which it was held that a Commissioner in Equity, giving new sureties, on receiving a new appoint- *385 ttient, must be held to have paid to himself, unless an actual default were shown. As where he had been ordered to pay over money during his first term, and had failed to do so. But though I myself delivered the opinion to that effect, I think the former case is founded on better reason. It was the business of the former sureties to show that he had paid over to his successor — to himself, as his own successor. This was their undertaking, and they must abide the consequences of their being unable to do so. The presumption against the first sureties is, that he did not pay over; against the second, that he did receive. If the officer had not been re-appointed, but had gone out of office with funds in his hands, it might be said he had committed no default while in office; but his sureties would be bound for his paying over to his successor, and the proof would be on them. This construction seems to me to be the most conformable to justice, and to the analogy of law, best calculated to promote the public security, and especially that of infants, whose interest it is the duty of the Court to protect.
There seems to be a difference, when, without revoking the first appointment, new security is ordered to be given, and is given accordingly. Here, it might be said, there can be no question as to past or future liabilities. There seems to me to be something vague and confused in some of the cases in relation to the power of the court to discharge from future liabilities. There can, it would seem, be no discharge from future liabilities, except by a revocation of the appointment. It is said, as in Cureton vs. Shelton, 3 M’C. 417, that “admitting the discharge could operate as to future liabilities, it cannot affect those which did exist. There is no power which could release the securities from such.” This is, of course, on the ground that such discharge, from liabilities already incurred, would be an impairing of the obligation of contracts; but it would appear, to be just as much an impairing of the obligation of contracts to discharge from future liabilities without revocation. The undertaking of the bond calls for the entire administration, and while that administration continues it might be said there is no power to discharge it. But in the cases of Trimmier vs. Trail, and the Ordinary *386 vs. Bigham, & Hudson, it is said that the giving of new securities operates a discharge from future liabilities. This must be on the ground that the giving of new security is equivalent to the revocation of the appointment, and of the re-appointment of the same person with new sureties; and perhaps the distinction is merely nominal. It may be assumed that the Ordinary has given all the relief which it was in his power to give.
But I think the new surety must be bound for the whole administration, including past, as well as future liabilities. The guardianship is one and entire, and he undertakes for that. Under the act of the Legislature, for giving relief to administrators, the effective relief would be to substitute the new surety for the old; discharging the latter entirely, and making the former liable for the whole administration. This is not done only because the Court has not the power to impair the obligation of a contract; but there is nothing to forbid the new surety’s binding himself to the same extent as the old, whether for past or future liabilities; and such are the plain terms and obvious purpose of his undertaking.
But there seems to be some difficulty in saying, that the ward, or distributee, should avail himself of both securities so as to recover to the full extent of both penalties. In the case before us, and in the case of the administrator, the new bond was not given for his security. He might be ignorant of its existence. He was content with the security which he already had, as sufficient to protect all his interest. It was at the instance of the former surety, and only for his benefit, that the new security was taken. Unlike the case of a new estate coming into the guardian’s hand, who is thereupon required to give securi-to in a larger penalty, or a new penalty, it should seem that the ward ought only to recover to the extent of the penalty of the first bond.
Yet, being given, though not at his instance, the ward may avail himself of the new security. He may sue either of the bonds or both, at law, and recover the amount of both penalties. It only remains to enquire his rights and the relative rights of the securities in this Court.
When a party interested in the estate becomes dissatis *387 fied, in relation to the solvency of the sureties, and requires new security, which is given, it would seem that the new security is only collateral to the former. Such is the very nature and purpose of the new surety’s undertaking, to make good any loss arising from the former’s insolvency: to be the security of a security. If, therefore, the party entitled should recover from the old surety, to the full extent of the penalty of the bond, the collateral security, I apprehend, must be discharged in this Court, and the old surety would have no right of contribution against the new.
But when it is the surety himself who becomes dissatisfied with his responsibitity, and seeks to be relieved, the converse seems to follow. The Court cannot substitue a new security, so as to discharge the former from his contract. But there is nothing to forbid its requiring a new security, which, as between the sureties themselves, shall be the primary one, leaving the former only collateral: and such seems to be the nature of the new surety’s undertaking. There can be no doubt in this case. The testimony of Mr. Grayson is express, that the intention of the parties was, that John S. Field should be substituted in the place of Dr. Stoney, so as to discharge the latter. According to the case of Craythorne vs. Swinburn, parol testimony is admitted to show the relative liabilities of the different sureties. As determined in Dearing vs. Winchelsea, the right to contribution depends on an equity; but according to a well known rule, parol evidence may be received to rebut an equity; and if the parties agree that there shall be no contribution, though by parol, none will be enforced by the Court. They may arrange their liabilities and priorities as they will. For reasons before given, Dr. Stoney could not be discharged from all responsibility, but the surety might well assume the primary liability.
It follows, that if Dr. Soney had paid his bond with liis own money, he would have a right to be reimbursed in full by Field, to the extent of the penalty of his bond. If Field had paid off his bond, he could have recovered nothing against Stoney. If Pelot and wife had released Stoney, though voluntarily, this would have had no effect in discharging Field. But if they had released Field, *388 this must have had the effect of discharging Stoney. And this agrees with the intimation of the Court in the case of the Ordinary vs. Bigham and Hudson; and the same rule of relative liabilities and priority seems, according to the cases, to apply, when a guardianship or administration is rovoked and the guardian, or administrator, reappointed, with new sureties.
One surety, having a counter surety, is bound to apply it to the benefit of his co-sureties, equally with himself. In this case, by the assignment of the bond and mortgage, Stoney has applied his security altogether to the exoneration of Field. As I have said, if Stoney had paid the bond with his own money, he would have a right to be reimbursed in full. But, as against Pelot and wife, Field would be discharged, they being entitled to no security, beyond the penalty of Stoney’s bond. He has not paid his own money, however, but has transferred a security on Henry Field, and if this produces an amount equal to the penalty of Stoney’s bond, .Field will be as much discharged as if Soney had paid his own money. But the latter will have no title to be reimbursed, as the satisfaction will be from the estate of Henry Field. Whatever this security may produce, it should, I think, be regarded as a satisfaction of both penalties. If it should produce more than enough to satisfy the penalty of Field’s bond, I think Pelot and wife willbe entitled to be satisfied out of the proceeds, the sum of three hundred and sixty dollars, the amount by which the penalty of Stoney’s bond exceeded that of Field. It was the former bond that the mortgage was intended to secure.
I think that no definitive order can be made with respect to the mortgaged land, unless Norton were a party to the suit. If he is bound to perform his contract, the complainants to the cross bill choosing on their part to confirm the contract of sale by John S. Field, they are entitled to the benefit of that contract. And if he has remained in possession until the present time and a good title can now be made him, it is difficult to conceive on what ground he can resist the performance. But on this point he has a right to be heard. If the present bill sufficiently puts in issue the question of his liability on his *389 contract, lie may answer to that: if not, some supplimen-tary proceeding will he necessary. The parties must proceed as they shall be advised.
It is ordered that the circuit decree be modified according to the views herein expressed; that so much of the decretal order as directs that the defendant, Mrs. Isabella C. Field, pay to the complainants the amount which may be found due them from the estate of Henry Field, over and above the amount of nine thousand, three hundred and sixty dollars, be reversed, and that any order respecting the plantation, called Linden, be reserved.